Mrs. Guadalupe Postell McILVEEN, a widow, Appellant,

v.

David W. McILVEEN et al., Appellees.

No. 13483.

Court of Civil Appeals of Texas.

Houston.

Feb. 4, 1960.

Julia Mae Anderson, Houston, for appellant.

Kirchheimer & Kirchheimer, Joseph Kirchheimer, Houston, for appellees.

WERLEIN, Justice.

The only issue in this case, other than a jurisdictional question hereinafter mentioned, is whether appellant, Guadalupe Postell McIlveen, was the common law wife of the deceased, Alfred McIlveen, at the time of his death on February 10, 1956. Since this is an appeal from an instructed verdict against appellant and in favor of

appellees, who are the surviving brothers and sisters of the deceased, including David W. McIlveen, administrator of his estate, we are called upon to determine whether there is any evidence in the record which required submission of the case to the jury. In doing so, we must view the evidence in the most favorable light to appellant. Conflicts in the testimony must be disregarded and every intendment reasonably deducible from the evidence must be indulged in favor of the losing party. This Court will assume that the facts shown by appellant's evidence are true facts. 4 Tex.Jur.2d, pp. 320–1, Appeal and Error, § 802, and authorities cited. In view of the instructed verdict, our statement of the evidence will comprehend only that which is favorable to appellant.

■■ In order to establish a common law marriage it is necessary to show not only cohabitation of the parties as man and wife and their holding each other out to the public as such, but also that such conduct has been pursuant to an agreement to presently become man and wife. Shelton v. Belknap, 155 Tex. 37, 282 S.W.2d 682. The agreement necessary to the validity of a common law marriage may be an express agreement or implied. Consolidated Underwriters v. Kelly, Tex.Com.App., 15 S.W.2d 229.

Appellant testified that the deceased, McIlveen, first asked her to be his wife in January of 1955, and at such time he told her he was divorced and gave her a set of rings. The January agreement to become man and wife was entered into on January 25, 1955, the day following appellant's divorce from Frank Postell. In April, 1955, appellant for the first time learned that the deceased had not obtained his divorce until March, 1955. She testified that she was greatly upset and felt awful bad because he had lied to her, and she gave the rings back to McIlveen, and moved out sometime between April and July, 1955. On July 29, 1955, she entered into a ceremonial marriage with a man by the name of Garza, and went with him to the State of Michigan.

There she found out that he had a wife. Garza testified by deposition that he was married at the time of his marriage with appellant and also at the time she left him in September, 1955 and returned to Houston.

During the time she was in Michigan she corresponded with McIlveen and had a telephone conversation with him in which she agreed that she would come back and be his wife, and later be married "by the Catholic Church." She returned to Houston on September 20 or 23 with Frankie, a nine year old son by a former marriage. McIlveen met her at the railroad station in Houston and put the rings on her finger. She testified: "He said 'you are back again, you are my wife, going to be my wife and going to be happy, you and Frankie and I' and hugged me and kissed me." She also testified, when asked what happened when she met him:

"A. Yes maam, that's the first thing he did, put them back and hugged me and kissed me and hugged the boy and he said I have a home—David, that's his brother, and I been fixing home and we went home.

"Q. Did he tell you he was fixing a home for you? A. Yes sir, he said David and I fixing the home for you and Frankie.

"Q. Where was this home? A. 10521 Munn, where I live now.

"Q. Did you go directly from there when Mr. McIlveen met you at the train? A. Yes sir."

She further testified that the marriage "Happened when we made agreement over the phone before I left Michigan and then when I got here." Her testimony was that she lived continuously with McIlveen until he died.

It is undisputed that appellant, after her return from Michigan, went with McIlveen to the home on Munn Street which he had repaired and there lived with him following the alleged agreement in September.

Appellant testified substantially as follows: The deceased after the September agreement introduced her as his wife at Lack's where they bought a bicycle for Frankie on credit. She was allowed to make purchases on that account. Appellant knew all of McIlveen's brothers and sisters and some of them visited in her home, and she and her husband visited some of them. They were friendly with her until after McIlveen's death. McIlveen introduced her to all the neighbors as his wife, and some of the neighbors visited in her home. She and McIlveen received from neighbors in December, 1955 two Christmas cards addressed to them as Mr. and Mrs. McIlveen. She further testified that since September of 1955 she always went under the name of Lupe Postell McIlveen. She did not change her social security number, and there is evidence that she continued to use the name "Postell" after her alleged marriage in September. This evidence, however, goes merely to her credibility, and does not constitute an admission that she did not hold herself out as the wife of the deceased. She further testified in substance: The doctors at the hospital knew she was McIlveen's wife and taking care of him. She and McIlveen visited her parents and she told them they were married. All the neighbors called her Mrs. McIlveen. The nurses and other employees at the Northshore Hospital, where she worked, knew her as Mrs. McIlveen and knew her husband. She had accounts at Lack's, Sears on Main Street, and at Grant's in the name of McIlveen. The reason she didn't sign her name "McIlveen" at Deaton Hospital, where she had worked, was that her social security was never changed. When asked who told her that she could make a claim as a common law wife, she testified that Alfred (McIlveen) told her that.

The holding out of appellant and McIlveen as husband and wife was corroborated by a number of witnesses. Mrs. Morales testified that she stayed in their home several days and visited them in October and November of 1955 and in January of 1956., She heard McIlveen introduce appellant as his wife to several different people, and testified that they acted as other married couples do. Ida Barrow, a neighbor, testified that McIlveen introduced appellant as his wife in a store, where the witness first met him, and that when she visited at the hospital she asked for Mrs. McIlveen and that she got "Lupe", the appellant. Marie Flores testified that McIlveen referred to Lupe as his wife, and that she referred to him as her husband, and that they seemed to be awfully fond of each other, and that she sent them a Christmas card addressed to Mr. & Mrs. McIlveen, and that she and her husband visited Mr. and Mrs. McIlveen in their home, and that the neighbors referred to them as Mr. and Mrs. McIlveen. Everlee Beasley testified that she had worked with appellant at Deaton Hospital, and knew her husband, Alfred McIlveen, having met him when he brought some lunch to the hospital. Appellant introduced him to her as her husband. Estelle Kennedy testified that she had heard McIlveen refer to appellant as his wife. Mr. Meadows testified that appellant told him and his wife both before and after McIlveen died that she was his wife, and also that McIlveen said he was bringing his wife and when she came to the Meadows' house he assumed she was.

Appellees have pointed out in their brief that there are numerous conflicts in the testimony and perhaps some inconsistencies. Such conflicts and inconsistencies, however, have to do with the credibility of the appellant and the weight of her testimony. They might be very important in determining the sufficiency of the evidence to support a common law marriage, but in determining whether there is any evidence they must be disregarded, under well established rules of law.

Appellees assert that appellant testified that it was her intention to marry in the Catholic Church. Appellant actually testified with respect to whether they were planning to get married in the Catholic

Church: "That's right, we make an agreement and got married and he was going to Catholic Church so we could get married because I promised my folks the next time I would get married in the Catholic Church —you just can't—a Baptist can't go to the Catholic Church and say they want to be a Catholic—it takes time." She also testified that had Alfred lived a little longer they would have gotten married. The record shows that this testimony had reference to getting married in the Catholic Church. We quote the testimony on cross-examination as follows:

"Q. Now, you wanted Alfred to be a Catholic before you married him, didn't you?

"A. We were already married, you mean before we married to the Catholic Church—before we went to ceremony —that's what I mean because we were already married."

■ We are not unmindful of the rule enunciated in Stanolind Oil & Gas Co. v. State, 136 Tex. 5, 145 S.W.2d 569, that where a litigant admits positive and definite facts, which if true would defeat his right to recover, and such statements or admissions are not subsequently modified or explained by him to show that he was mistaken, although testifying in good faith, he is conclusively bound by such statements and cannot successfully complain if the court directs a verdict against him. In the instant case there is nothing inconsistent with appellant's agreement in September to enter into a common law marriage with the deceased, and her intention later to enter into a ceremonial marriage in the Catholic Church. A careful examination of the record fails to disclose any admissions of positive or definite facts sufficient to defeat appellant's claim of common law marriage as a matter of law.

Appellees further contend that the trial court correctly directed a verdict against appellant because the evidence showed that the relationship between her and the de-

ceased had begun in an illicit affair, and that the evidence introduced by her was not the necessary clear and convincing evidence necessary to establish a common law marriage where the prior relationship was meretricious. It is true that appellant admitted that she and the deceased lived together for a few weeks in June or July, at a time when she knew that they were not husband and wife. This meretricious relationship, however, terminated at, if not before, the time when she left McIlveen and entered into a ceremonial marriage with Garza and moved to the State of Michigan. Accepting as true her testimony, there is nothing in the record to show any meretricious relationship after the marriage agreement entered into in September on her return to Houston. At that time there were no impediments to their marriage. McIlveen had secured a divorce from his former wife and appellant's marriage to Garza was a nullity since he was a married man. See Texas Employers Insurance Association v. Elder, 155 Tex. 27, 282 S.W.2d 371; McCormick and Ray, Texas Law of Evidence, Second Edition, § 89, pp. 108–9.

Our Supreme Court, in Shelton v. Belknap, supra, stated:

"The testimony of Coyzet is that she and M. A. began an illicit relationship about one week after her divorce, which relationship continued to the time of the conversation. But a relationship begun in illegality may, in the absence of impediments and by the consent and agreement of the parties, put on the cloak of legality. Consolidated Underwriters v. Kelly, Tex.Com.App., 15 S.W.2d 229. This is recognized in Cuneo v. De Cuneo, 24 Tex.Civ. App. 436, 59 S.W. 284, 286, cited in this case by the Court of Civil Appeals, where it is said: 'But the presumption against marriage, when the connection between the parties is shown to have been illicit in origin, may be overcome by proof showing that the original connection has changed its character; and a subsequent marriage may be proved

by circumstances. The circumstances, however, must be such as to exclude the inference or presumptions that the former relation continued, and show that it had been changed into that of actual matrimony by mutual consent.' The courts should not be loath to approve the efforts of parties to change an illegal to a legal relationship." [155 Tex. 37, 282 S.W.2d 685.]

The case of Brown v. Brown, Tex.Civ. App., 115 S.W.2d 786, relied on by appellees, is factually distinguishable from the present case in that the only agreement of the parties to live together as husband and wife was made between the alleged common law wife and the deceased at a time when she knew his wife was living. Therefore, the agreement was unlawful. This Court held the original unlawful agreement was not sufficient to transform the adulterous relationship into a lawful one, upon the mere removal of deceased's impediment to marriage, following his divorce. There was insufficient evidence of any agreement to be husband and wife made by the parties subsequent to the divorce and no positive and satisfactory evidence that the relationship which was meretricious in its inception later became lawful.

Perales v. Flores, Tex.Civ.App., 147 S.W. 2d 974, writ ref., is also distinguishable. In that case the testimony showed that the agreement of marriage relied upon created only a status determinable at will. Such agreement, therefore, did not create a status recognized as marriage under the Common Law as applied in this State.

■ Appellees assert that the District Court did not have jurisdiction to determine whether the agreement entered into in September resulted in a common law marriage because in the County Court the only agreement pleaded was made in January. We do not agree. The ultimate issue, both in the County Court and in the District Court,

was whether appellant was the common law wife of McIlveen at the time of his death. That issue was tried in the County Court and the appeal was taken to the District Court on that controlling issue. In appellant's amended pleading filed in the District Court, the date of the agreement and marriage was not alleged. Appellees did not except to the pleading on that ground and no objection was made at the trial to the admission of evidence in regard to the September agreement.

Upon perfection of the appeal to the District Court, jurisdiction was conferred upon that court of the entire case and of all issues therein. Rule 334, Texas Rules of Civil Procedure, provides that the trial in the District Court shall be de novo, and shall be governed by the same rules of procedure as other civil cases in said court. The amended pleading filed in the District Court did not change the cause of action which involved a determination of whether the status of marriage existed between the parties. That depended in part upon whether they had, prior to McIlveen's death, entered into an agreement of marriage, express or implied. The exact date thereof was not controlling so long as no impediments to the marriage existed at such time. See Pruett v. Hamilton, TexCiv.App., 263 S.W.2d 193, ref., n. r. e.

We have examined the authorities cited by appellees in regard to jurisdiction. Suffice it to say that they are inapplicable to the factual situation in the present case.

We have concluded that appellant's Points of Error complaining of the instructed verdict should be sustained. It, therefore, becomes unnecessary to consider the remaining Points of Error which pertain to questions that may not arise upon another trial.

The judgment of the Trial Court is reversed and the case is remanded.

Reversed and remanded.